UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITEDHEALTHCARE INSURANCE COMPANY,<br><br>*Defendant.* | No. 26-cv-12853-PGL |

**ORDER ON MOTION TO REMAND**

LEVENSON, U.S.M.J.

INTRODUCTION

The Commonwealth of Massachusetts (the "Commonwealth") has moved to remand this case, sending it back to Massachusetts state court.

The Commonwealth has sued UnitedHealthcare Insurance Company ("United") under the Massachusetts False Claims Act ("MFCA") and Massachusetts common law, alleging that United defrauded the Commonwealth's Medicaid program, MassHealth.[1] Docket No. 13-1 ("Complaint") ¶¶ 221–52. United contracted with the Commonwealth to develop and administer a Senior Care Organization ("SCO") Plan,[2] which provided care to eligible MassHealth members, aged 65 and over. *Id.* ¶¶ 1, 25. United was paid a monthly capitated rate for each

[1] *See generally* M.G.L. ch. 118E, § 9A (defining authority of MassHealth to implement Medicaid).

[2] An SCO Plan is a kind of Managed Care Entity, and each forms a network of providers to administer services to members. *See* Docket No. 13-1 ¶¶ 18–20 (detailing the Commonwealth's use of Managed Care Entities to provide Medicaid services); *see generally* 130 C.M.R. § 508.008 (outlining regulations covering SCOs).

patient enrolled in the United SCO Plan, with rates based on the patients' overall health conditions. *Id.* ¶ 1. United was responsible for assessing the health of the enrolled patients and for making recommendations to MassHealth to sort patients into three "rate levels" (also termed "rate cells"): Level 1 for the healthiest, Level 2 for patients with behavioral health or substance use disorders, and Level 3 for patients with the most serious health conditions and healthcare needs. *Id.* ¶¶ 1–2, 31–38. Total monthly payments to United were based on the number of patients at each rate level. *See id.* ¶¶ 1–2.

The Complaint alleges that United gamed the system by falsely listing some patients at Level 2 who did not have any diagnosis or treatment for behavioral health or substance use disorders, and by listing some patients at Level 3 who did not require the kind or frequency of skilled nursing services that would have supported a Level-3 ranking. *Id.* ¶¶ 4–6. "These misrepresented assessments have resulted in United receiving and retaining more than $100 million in fraudulent payments from MassHealth." *Id.* ¶ 10.

After the Commonwealth filed its Complaint in the Massachusetts Superior Court, United removed the case to federal court. Docket No. 1. United asserts that this case falls within the Court's "federal question" jurisdiction, even though—on the face of the Complaint—the Commonwealth's claims are based entirely on state law. *Id.* ¶ 19. Invoking the concept of a "necessarily raised" federal issue, United asserts that the Commonwealth's claims will require the Commonwealth to prove that MassHealth complied with various federal laws and regulations regarding Medicaid. *Id.* ¶¶ 19–21. Broadly speaking, United contends that MassHealth is to blame for any misclassification of patients because MassHealth didn't provide clear enough guidance, and that such failure to provide proper guidance amounted to a violation of federal Medicaid rules. *Id.* ¶¶ 23, 26.

The Commonwealth insists that its claims rest entirely on state law, and that the federal Medicaid rules merely provide some background for the business dealings between MassHealth and United. Docket No. 15 at 13–14. In the Commonwealth's view, this case doesn't belong in federal court. *Id.* at 13–22.

As discussed below, United has failed to meet its burden, as the removing party, to establish federal jurisdiction. Even though the federal regulatory framework may provide some background for the events at issue, federal regulations are not central to the issues here. Importantly, while United may invoke federal regulations in defending against the claims in this case, it is the *Complaint* (and not the defense) that determines the availability of federal-question jurisdiction.

The Commonwealth's motion is ALLOWED, and the case is REMANDED.

## I. Background

The facts presented below and discussed throughout this report are drawn from the Complaint, except where otherwise noted.

### *A. SCO Plans*

The Commonwealth launched its SCO Plans in 2004 within a Medicaid demonstration program.[3] Complaint ¶ 22. Medicaid operates as a federal-state partnership, with a portion of the budget paid through federal funding and the remainder funded by the Commonwealth. *Id.* ¶¶ 16–17. The federal Medicaid statute establishes minimum standards for state Medicaid programs to qualify for federal funding. *Id.* ¶ 17.

---

[3] Specifically, the SCO Plans were launched under Section 1115(a) of the Social Security Act, pursuant to which the Centers for Medicare & Medicaid Services ("CMS") has "authority to approve experimental, pilot, or demonstration projects that are found by it to be likely to assist in promoting the objectives of the Medicaid program." *See* Complaint ¶¶ 21–22.

SCO Plans connect MassHealth members—those who opt to enroll—to a "comprehensive network of medical, health care and social service providers that integrates all components of care, either directly or through subcontracts." *Id.* ¶ 23 (quoting M.G.L. ch. 118E, § 9D(a)); *see id.* ¶¶ 24–26 (citing M.G.L. ch. 118E, § 9D(c), then citing 130 C.M.R. § 520.008).[4]

United has contracted with MassHealth since the inception of the SCO program in 2004. *Id.* ¶¶ 22, 51. United was one of six MassHealth SCO Plan providers as of 2026. *Id.* ¶ 26. The terms of United's contract with MassHealth require United to comply with all applicable statutes and regulations. *Id.* ¶ 53.

### *B. Required Assessments, Rate Levels, and Capitated Rates*

All SCO Plan provider contracts require SCO Plan providers to assess new members (patients) within 30 days after enrollment. *See* Complaint ¶¶ 42, 64–66; *see also id.* ¶ 38 (describing SCO plan providers as "responsible for conducting and documenting their own clinical assessments of members to determine the appropriate level of care"). Upon completion of the assessment, the information on the enrollee's needs must be submitted to the Commonwealth. *Id.* ¶ 41.

Upon enrollment, United first interviews a new enrollee to determine what services they are currently receiving. *Id.* ¶ 66. If an enrollee is "receiving little or no services" and does not have significant medical conditions, a "Geriatric Services and Support Coordinator, typically a social worker," performs the initial assessment for United. *Id.* If, however, United identifies significant medical conditions—either through the interview or the initial assessment—then a

[4] "SCO Plans are responsible for providing members with the full continuum of MassHealth covered services through their network of contracted providers," and a team of network providers, including a primary care physician, work together "to create an individualized care plan which is supposed to be specific to fit the needs of each member enrolled in the SCO Plan." Complaint ¶¶ 27–28.

field nurse conducts a more detailed assessment. *Id.* ¶ 67. This more detailed assessment must be conducted in-person at the enrollee's home (*id.* ¶¶ 39, 69), with the results recorded in a written document, known as the Minimum Data Set – Home Care 2.0 ("MDS-HC").[5] *See id.* ¶¶ 38, 67–69. MassHealth requires SCO Plan providers like United to conduct follow-up evaluations on an ongoing, periodic basis. *Id.* ¶ 42. MassHealth relies on the accuracy of the MDS-HC assessments submitted by SCO Plan providers. *Id.* ¶ 44.

The information gathered in the MDS-HC assessments is used to determine each member's rate level. *Id.* ¶ 41. To receive a Level 3 classification ("Nursing Home Certifiable"), a member must either require skilled services (such as nursing or therapy services) on a daily basis or, in combination, require assistance with two or more activities of daily living and require skilled services at least three times weekly. *Id.* ¶¶ 34, 41, 194–95. Enrollees with Level 2 classifications ("Behavioral Health") "include members who do not meet the Level 3 criteria but have a diagnosis for a behavioral health or substance use disorder." *Id.* ¶ 35; *see id.* ¶¶ 41, 142–45. Level 1 ("Community Other") is the "lowest level of care," and members are assigned Level 1 by default if the member does not meet the criteria for Level 2 or Level 3 (or the SCO Plan provider does not submit an MDS-HC form). *Id.* ¶¶ 36, 41.

SCO Plan providers are paid capitated rates, *i.e.*, "a set dollar payment per member per month to cover a specified set of services and administrative costs for the member without regard to the actual number of services provided," based in part on the three rate levels ("rate cells") described above. *Id.* ¶¶ 30–33. The capitated rates increase with each rate level: For example, for

---

[5] For some of the years that United participated as an SCO Plan provider, United employed a separate team of nurses who reviewed MDS-HC form data to ensure "quality control" before the data was submitted to MassHealth. Complaint ¶¶ 74–75. The Complaint alleges that this internal auditing function was later scaled back significantly. *Id.* ¶¶ 125–40.

an SCO Plan member residing in eastern Massachusetts in 2025, the monthly Level 1 rate was $1,305.57, whereas for Level 2 it was $1,831.14, and for Level 3, $4,265.49. *Id.* ¶ 45.

### *C. Alleged Overbilling*

The Commonwealth alleges that United knowingly and intentionally falsified MDS-HC assessments by overstating members' diagnoses and/or care needs. Complaint ¶¶ 3–7.

As to Level 3 assignments, the Commonwealth alleges that United improperly trained its staff to record certain patients as receiving skilled services daily for all seven days in the week prior to the assessment, regardless of whether such services had actually been provided. *Id.* ¶¶ 194, 197, 204–06. The Complaint alleges that field nurses were pressured to exaggerate diagnoses and to complete MDS-HC assessments with a goal of meeting the requirements for Level 3. *See id.* ¶¶ 104–10, 160 ("She characterized her training as instructions on 'how to make members a certain level.'").

As to Level 2 assignments, the Complaint alleges that United improperly designated SCO Plan members at Level 2 even though some of those patients had not received behavioral health or addiction diagnoses and/or treatment.[6] *Id.* ¶¶ 141–42. Over time, United removed guardrails (such as internal audits to verify diagnoses and treatment plans) in order to foster the misclassification of patients at Level 2. *Id.* ¶¶ 147–48.

The Complaint links United's alleged misclassification of patients to United's alleged understaffing of its nursing teams. *See id.* ¶¶ 8, 84–101. The understaffing created an incentive for overworked nurses to overstate patient needs on their MDS-HC assessments as a means of

---

[6] For a member to qualify for Level 2 coding, "the MDS-HC assessment must record both a diagnosis of behavioral health or substance use disorder and a treatment corresponding to that diagnosis." *Id.* ¶ 142.

limiting the total of number of patients under their care; for purposes of setting nurses' workloads, one Level-3 member was equivalent to two Level-2 members. *Id.* ¶¶ 93–94.

### *D. The Commonwealth's Claims*

The Commonwealth brings six state-law claims against United. *See* Complaint ¶¶ 221–52. In order to assess United's assertion that federal law issues are necessarily raised by the Commonwealth's claims, we'll begin by parsing the elements of the claims themselves.

#### *1. MFCA Claims*

The Commonwealth brings four counts under the MFCA. *Id.* ¶¶ 221–42. To prevail on its MFCA claims, the Commonwealth will have to establish that United:

> (1) knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval;
>
> (2) knowingly ma[de], use[d] or cause[d] to be made or used a false record or statement material to a false or fraudulent claim;
>
> * * *
>
> (9) knowingly ma[de], use[d] or cause[d] to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth . . . or knowingly conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the commonwealth . . . ;
>
> (10) [wa]s a beneficiary of an inadvertent submission of a false claim to the commonwealth . . . or [wa]s a beneficiary of an overpayment from the commonwealth . . . and . . . subsequently discover[ed] the falsity of the claim or the receipt of overpayment and fail[ed] to disclose the false claim or receipt of overpayment to the commonwealth . . . by the later of:
>
>> (i) the date which [wa]s 60 days after the date on which the false claim or receipt of overpayment was identified; or
>>
>> (ii) the date any corresponding cost report [wa]s due, if applicable.

M.G.L. ch. 12, § 5B(a).

The false claims at the core of each MFCA count in this case consist of allegedly inaccurate MDS-HC assessments. *See* Complaint ¶¶ 223, 229, 235, 240.

### 2. *Unjust Enrichment*

The Commonwealth also asserts a claim for unjust enrichment. *Id.* ¶¶ 243–48. To prevail on this claim, the Commonwealth "must establish that (1) it 'conferred a measurable benefit' on [United], (2) it 'reasonably expected compensation,' and (3) '[United] accepted the benefit with knowledge' of that reasonable expectation." *See Tody's Serv., Inc. v. Liberty Mut. Ins. Co.*, 496 Mass. 197, 200 (2025) (quoting *Columbia Plaza Assocs. v. Northeastern Univ.*, 493 Mass. 570, 589 (2024)). The gist of this claim is that United was overpaid. That is, that United received money from MassHealth, without providing to MassHealth the agreed-upon value in return. In common with the MFCA claims, the unjust enrichment claim arises from the allegation that United submitted inaccurate MDS-HC assessments to MassHealth. *See* Complaint ¶¶ 244–46.

### 3. *Breach of Contract*

Finally, the Commonwealth asserts a claim for breach of contract. *Id.* ¶¶ 249–52. To prevail on this claim, the Commonwealth "must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the [Commonwealth] was ready, willing, and able to perform [its] part of the contract; [United] committed a breach of the contract; and the [Commonwealth] suffered harm as a result." *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 690 (2016). Like all the other claims in this case, the breach of contract claim is centered on the allegation that United submitted inaccurate MDS-HC assessments to MassHealth. *See* Complaint ¶¶ 250–51.

## II. Legal Standards

The federal courts "are courts of limited jurisdiction" with "only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994)). The Constitution gives the federal judiciary jurisdiction over "all Cases, in Law and Equity, *arising under* this Constitution, the

Laws of the United States, and Treaties made, or which shall be made, under their Authority." U.S. Const. art. III, § 2, cl. 1 (emphasis added). Congress has approved a similar grant of jurisdiction to the district courts, which "have original jurisdiction of all civil actions *arising under* the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (emphasis added).

***A. Removal***

"Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987); *see* 28 U.S.C. § 1441(a) ("[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . ."). A defendant seeking to remove a state-court action to federal court bears the burden to "make a 'colorable' showing that a basis for federal jurisdiction exists." *Danca v. Private Health Care Sys., Inc.*, 185 F.3d 1, 4 (1st Cir. 1999). Removal statutes, such as Section 1441(a), are construed "*strictly* and *against* removal." *Rhode Island v. Shell Oil Prods. Co., LLC*, 35 F.4th 44, 52 (1st Cir. 2022) (citing *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002)). Considering this principle, "if federal jurisdiction is doubtful, a federal court must remand to state court." *Id.*

The viability of United's removal to this Court depends on whether federal-question jurisdiction exists.[7] Although there are narrow exceptions, which we will consider in more detail, ordinarily cases that fall within federal-question jurisdiction will be "those in which federal law creates the cause of action." *Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 808 (1986);

---

[7] While diversity of citizenship can sometimes provide a basis for federal court jurisdiction, lawsuits like this one involving a state government do not fit that category. *See Caterpillar, Inc.*, 482 U.S. at 392; *see also Postal Telegraph Cable Co. v. Alabama*, 155 U.S. 482, 487 (1894) (noting "it is well settled that a suit between a state and a citizen or a corporation of another state is not between citizens of different states").

*see Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003) ("As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim."). The mere prospect that federal law issues may come up in the course of litigation does not make a case one "arising under" the Constitution or laws of the United States; the Supreme Court has interpreted the "grant of federal-question jurisdiction" in 28 U.S.C. § 1331 "as conferring a more limited power" than "extend[ing] to all cases in which a federal question is an ingredient of the action." *Merrell Dow*, 478 U.S. at 807 (citation modified).

### *B. Well-Pleaded Complaint Rule*

Under the "well-pleaded complaint rule," "federal[-question] jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc.*, 482 U.S. at 392; *see Merrell Dow*, 478 U.S. at 808 ("[T]he question whether a claim 'arises under' federal law must be determined by reference to the 'well-pleaded complaint.'"). This "rule makes the plaintiff the master of the claim," and the plaintiff may choose to "avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar, Inc.*, 482 U.S. at 392. The requirement that a federal question must be presented on the face of the complaint means that "[a] *defense* that raises a federal question is inadequate to confer federal jurisdiction." *Merrell Dow*, 478 U.S. at 808 (emphasis added); *see Caterpillar, Inc.*, 482 U.S. at 398 ("[T]he presence of a federal question . . . in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule . . . .").

### *C. Grable*

There are limited exceptions to the general rule that only federal-law claims can support an assertion of federal-question jurisdiction. The Supreme Court's 2005 decision in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), recognized that federal-question jurisdiction extends to a small class of "claims recognized under

state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." 545 U.S. at 312.

*Grable* and its progeny set forth a four-prong test, recognizing federal-question jurisdiction only "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. All four *Grable* factors must be satisfied, to ensure "there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Id.* (quoting *Grable*, 545 U.S. at 313).

Importantly, the well-pleaded complaint rule still applies when considering *Grable*. As the Court has noted, it is the *complaint*, and not some issue raised by way of defense, that determines the availability of federal-question jurisdiction:

> On rare occasions, the grant also covers a suit containing state-law claims alone, because one or more of them "necessarily raise[s]" a "substantial" and "actually disputed" federal question. [*Gunn*, 568 U.S. at 258]. Either way, the determination of jurisdiction is based only on the allegations in the plaintiff's "well-pleaded complaint"—not on any issue the defendant may raise. *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 9–10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). That longstanding rule makes the complaint—the plaintiff 's own claims and allegations—the key to "arising under" jurisdiction. If the complaint presents no federal question, a federal court may not hear the suit.

*Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025).

Before considering the specifics of the parties' arguments, it is worth reviewing each of the components of the *Grable* test:

*1. Necessarily Raised*

A federal question is "necessarily raise[d]" when "'it is not logically possible for the plaintiff[ ] to prevail . . . without affirmatively answering the [federal] question.'" *Tyngsboro*

*Sports II Solar, LLC v. Nat'l Grid USA Serv. Co., Inc.*, 88 F.4th 58, 66 (1st Cir. 2023) (quoting *R.I. Fishermen's All., Inc. v. R.I. Dep't Env't Mgmt.*, 585 F.3d 42, 49 (1st Cir. 2009)) (alterations in original). The plaintiff's claims must be more than "merely 'bound up' with federal interests; federal law must be an 'essential element' of the state-law claims." *Id.* (quoting *Shell Oil Prods. Co.*, 35 F.4th at 56–57). Nor is it sufficient that "a claim or defense requires an explanation of a federal statutory scheme as background." *Narragansett Indian Tribe v. R.I. Dep't of Transp.*, 903 F.3d 26, 32 (1st Cir. 2018). In other words, "speaking about federal law or federal concerns in the most generalized way is not enough for *Grable* purposes" if violation of federal law is not an element of any state-law claim at issue and there is otherwise no specific federal issue that must be decided for the plaintiff to prevail. *See Shell Oil Products Co.*, 35 F.4th at 57.

*2. Actually Disputed*

The parties must actually contest the embedded federal question. *See, e.g.*, *Gunn*, 568 U.S. at 259 ("The federal issue is also 'actually disputed' here—indeed, on the merits, it is the central point of dispute."); *R.I. Fishermen's All.*, 585 F.3d at 51 ("The parties have hotly contested the issue . . . . Thus, the federal question is actually disputed.").

*3. Substantial*

To meet the substantiality prong, the "embedded federal question" must be "'important to the federal system,' not just to the parties." *AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp.*, 15 F.4th 551, 558 (1st Cir. 2021) (quoting *Mun. of Mayaguez v. Corporacion Para el Desarrollo del Oeste, Inc.*, 726 F.3d 8, 14 (1st Cir. 2013)); *see Gunn*, 568 U.S. at 260 ("[I]t is not enough that the federal issue be significant to the particular parties in the immediate suit . . . . The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole."). Issues have been deemed to have importance to the federal system when the outcome of a lawsuit either (1) "could turn on a new interpretation of a federal statute or

regulation which will govern a large number of cases," or (2) "directly challenges the propriety of an action taken by 'a federal department, agency, or service.'" *Mayaguez*, 726 F.3d at 14 (quoting *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 700 (2006)). In contrast, when the issues in a case are "'fact-bound and situation-specific,'" such claims are "often not substantial under the *Grable* test." *Tyngsboro Sports II Solar*, 88 F.4th at 68 (quoting *Empire Healthchoice*, 547 U.S. at 700–01).

*4. Federal-State Balance*

The fourth prong of *Grable* is "concerned with the appropriate 'balance of federal and state judicial responsibilities.'" *Gunn*, 568 U.S. at 264 (quoting *Grable*, 554 U.S. at 314). Testing this prong requires assessing whether allowing federal adjudication would result in an "enormous shift of traditionally state cases into federal courts." *Grable*, 545 U.S. at 319.

## III. Discussion

As the removing party, United bears the burden of demonstrating that this Court has subject-matter jurisdiction.

To start with the obvious, the Commonwealth alleges only state-law claims, and there is no federal claim presented on the face of the well-pleaded complaint. Accordingly, United's theory depends on whether there is an unavoidable, embedded federal question in the Commonwealth's claims.

The Commonwealth argues that none of the four *Grable* factors are met here. Docket No. 15 at 13. The Commonwealth contends that federal law comes up, if at all, only in United's *defense* against the various state-law claims at issue here, and that this provides no support for United's invocation of federal jurisdiction. *See id.* at 9–22.

For its part, United urges that the *Grable* factors provide a basis for jurisdiction. *See* Docket No. 18 at 13–20.

### *A. United's Arguments*

United argues that, in order to prevail on its state-law claims, the Commonwealth must necessarily prove an embedded federal issue, *i.e.*, that MassHealth met its federal-law obligations in administering the SCO Plan program. *See* Docket No. 18 at 12–20. United contends that it is MassHealth's fault if any patients were misclassified because MassHealth provided deficient guidance about how to classify patients. *Id.* at 14. Furthermore, United posits that MassHealth's provision of deficient guidance violated federal mandates that govern the administration of Medicaid programs. *Id.*

United contends that the real issue here is *not* whether United misrepresented facts about its patients' medical conditions and history. Instead, United contends, the threshold issue is whether MassHealth provided adequate guidance to prevent confusion about how patients should be categorized by level of required care (so-called "rate cell recommendations"). *Id.* United contends that such guidance matters because "the rate cell recommendations that are being second-guessed by the [Commonwealth] involve challenging judgment calls based on the application of independently licensed registered nurses' clinical knowledge and experience with the benefit of in-person observations of members." *Id.*

So, what makes the adequacy of MassHealth's guidance an issue of federal law? In United's telling, it is that "time and again during the relevant period, MassHealth refused to provide sufficient guidance regarding these requirements in violation of its obligations under applicable federal laws and regulations." *Id.* at 5 (citing 42 C.F.R. §§ 441.302(b), 438.66; 42 U.S.C. §§ 1396a(a)(30)(A), 1396n(c)(2)(A)); *id.* at 14 (citing 42 C.F.R. §§ 438.4(b), 438.5, 438.66)).

One might expect, from United's accusation that MassHealth violated "obligations under applicable federal laws and regulations" (*id.* at 5), to see federal rules that dictate (or even

outline) what sort of guidance MassHealth was required to provide. But the regulations and statutes that United cites don't fit that bill. United fails to direct the Court to any federal regulation or statute that explicitly requires a state Medicaid agency to provide guidance to SCOs, let alone to any regulation or statute that addresses guidance about rate cell classifications.

The regulations that United cites are broadly worded mandates about financial accountability, auditing, and record keeping. For instance, a state Medicaid authority is required to "assure financial accountability for funds expended for home and community-based services, provide for an independent audit of its waiver program, . . . and . . . maintain . . . appropriate financial records documenting the cost of services provided . . . ." 42 C.F.R. § 441.302(b); *see* 42 U.S.C. § 1396n(c)(2)(A) (state must provide assurances that "necessary safeguards . . . have been taken . . . to assure financial accountability for funds expended with respect to" services provided pursuant to community-based services waiver). The state agency must also "have in effect a monitoring system for all managed care programs," which must address a wide range of areas, from claims management to finance to marketing. 42 C.F.R. § 438.66. There is also generalized guidance about how capitation rates[8] are to be set: The state must set "actuarially sound capitation rates,"[9] taking into account various data about the likely costs that will be incurred to provide services to the populations to be covered. *See* 42 C.F.R. § 438.5. But regulations about setting capitation rates—an entirely different step in the process from sorting enrollees into rate

[8] Recall that the capitated rates paid to SCO Plan providers represent "a set dollar payment per member per month to cover a specified set of services and administrative costs for the member without regard to the actual number of services provided." Complaint ¶ 30. The amount of the monthly capitation payments made to SCO Plan providers is then determined by the three rate levels into which enrollees are sorted. *See id.* ¶¶ 31–36.

[9] "Actuarially sound capitation rates" are defined as capitation rates "projected to provide for all reasonable, appropriate, and attainable costs that are required under the terms of the contract . . . ." 42 C.F.R. § 438.4(a).

levels—do not appear to have anything to do with any guidance United contends that MassHealth was required to provide about classifying patients by rate level.

Finding no support for United's position in the regulations it cites, we turn to the enabling statutes. But at the statutory level, we are even farther from anything that might resemble a federal mandate about the content of guidance from MassHealth to SCO Plan providers. United purports to derive such a mandate from the statutory requirement that state Medicaid authorities "assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A); *see* Docket No. 18 at 7 (quoting the statute). This broad language is a nonstarter for United's argument that federal law specifically required MassHealth to provide better guidance than it did.

### *B. Grable*

There are two fatal shortcomings in United's argument for federal jurisdiction. First, United's essential claim—that any misclassifications are MassHealth's fault because MassHealth's guidance was unclear—is plainly a *defense.* As such, it cannot provide the basis for federal jurisdiction. Second, United fails to identify any aspect of *federal* law that determines whether the guidance provided by MassHealth was sufficient.

Considering each of the *Grable* factors in turn underscores United's failure to establish federal jurisdiction.

#### *1. Necessarily Raised*

United argues that a federal issue is necessarily raised because the Commonwealth, it says, cannot establish the falsity, materiality, or knowledge elements of its MFCA claims without proving that MassHealth provided sufficient guidance about determination of rate levels. Docket No. 18 at 14–15.

Leaving aside that United is plainly describing a defense, and not an element of any claim,[10] we're still lacking any meaningful federal connection. United asserts that providing such guidance is part of MassHealth's "obligation under federal law to ensure 'financial accountability for funds expended.'" *Id.* at 14 (quoting 42 U.S.C. § 1396n(c)(2)(A)). The Commonwealth responds, persuasively, that the federal laws which United invokes "are generic and do not establish specific or detailed requirements MassHealth was required to adhere to." Docket No. 15 at 15. Furthermore, the Commonwealth points out that its claims can be fully resolved through resort only to state law and that United has introduced federal law into this dispute only as background. *See id.* at 13–14.

The Commonwealth is correct that United has failed to point to any necessarily-raised federal issue. Simply put, it is "logically possible for the [Commonwealth] to prevail" without proving that MassHealth complied with any particular federal-law obligations. *See Tyngsboro Sports II Solar*, 88 F.4th at 66 (quoting *R.I. Fishermen's All.*, 585 F.3d at 49). Although the SCO Plans were launched as part of a Medicaid program—which brings us into the realm of joint state and federal assistance—the Complaint would have to "do more than bring claims that are merely 'bound up' with federal interests" for it to necessarily raise a federal issue. *See id.* (quoting *Shell Oil Prods. Co.*, 35 F.4th at 56). The requisite "more" is not found here; none of the six counts in the Complaint require application of federal law to prove any "essential element[s]" of the claim. *See id*. (quoting *Shell Oil Prods. Co.*, 35 F.4th at 56). United cites no persuasive authority to

[10] That the federal question here arises only as a defense to the Commonwealth's state-law claims underscores the point that it is not necessarily raised as part of those claims. *See Massachusetts v. Fremont Inv. & Loan*, No. CIV.A.07-11965-GAO, 2007 WL 4571162, at *3 (D. Mass. Dec. 26, 2007) ("The federal question here does not appear to be a necessary or essential element of the Commonwealth's claim. Rather, it would only arise after the Commonwealth had first succeeded in proving the elements of a violation of Chapter 93A.").

support its assertion that the Commonwealth cannot prove the elements of its MFCA claims without demonstrating compliance with federal law as a threshold issue.

In sum, there can be no federal jurisdiction under *Grable* here because no federal issue that United has attempted to inject into this case is necessarily raised by the Complaint. All four *Grable* factors must be satisfied to invoke federal-question jurisdiction (s*ee Gunn*, 568 U.S. at 258), so this is enough to end the inquiry. That said, a few more nails will hold the lid firmly in place, so I will address the remaining *Grable* factors as well.

*2. Actually Disputed*

The parties do actually dispute whether MassHealth complied with its obligations. *See* Docket No. 15 at 17 ("[T]he Commonwealth *does* dispute that MassHealth failed to provide sufficient training to United and other SCO [Plan] providers.").

*3. Substantial*

United contends "that MassHealth violated its federal obligations by not establishing a rate cell category framework and issuing sufficient written guidance regarding rate cell requirements." Docket No. 18 at 19. To support its contention that such issues are substantial to the federal system, United rests its argument on the point that the federal government has taken various steps in exercising oversight over various states' joint federal and state Medicaid programs. *See id.* at 16–18.[11]

The Commonwealth responds that, because the dispute over whether MassHealth met its obligations is fact-specific and does not turn on an interpretation of federal law, it cannot be important to the federal system as a whole. *See* Docket No. 15 at 17. For good measure, the

[11] Conspicuously absent from United's litany of instances in which the federal government has challenged various states' administration of Medicaid programs is any instance involving rate cell categories.

Commonwealth further notes that no federal agency's performance is at issue in this case. *See id.* at 17–18.

Here too, the Commonwealth has the better of the arguments. Even if MassHealth's compliance with its federal-law obligations were necessarily raised by the Complaint, United has not demonstrated that this case raises a substantial issue for the federal system such that this Court should exercise jurisdiction.

First, this is not a case that "present[s] 'a nearly "pure issue of law . . . that could be settled once and for all"' as opposed to "an issue that is 'fact-bound and situation-specific' and whose holding will more likely be limited to the facts of the case." *Mayaguez*, 726 F.3d at 14 (quoting *Empire Healthchoice*, 547 U.S. at 700–01); *see One & Ken Valley Hous. Grp. v. Maine State Hous. Auth.*, 716 F.3d 218, 224–25 (1st Cir. 2013) (explaining that pure issues of federal law that would lead to resolutions in multiple cases may support federal jurisdiction). The federal issue that United seeks to litigate here is specific to the facts of MassHealth's guidance and training for SCO Plan providers and whether that guidance complied with the general federal obligations applicable to MassHealth.

Second, this dispute does not involve a "direct[] challenge[ to] the propriety of an action taken by 'a federal department, agency, or service.'" *Mayaguez*, 726 F.3d at 14 (quoting *Empire Healthchoice*, 547 U.S. at 700). Indeed, there is no challenge—direct or otherwise—to any action by a federal agency. On the contrary, United challenges the propriety of actions taken by a *state* entity: MassHealth.

United's arguments for substantiality founder on controlling First Circuit precedent. Pointing to the Supreme Court's decision in *Empire Healthchoice*, the First Circuit in *Mayaguez* abrogated its prior holding that "compliance with an 'intricate and detailed set of federal

regulatory requirements' and a connection to 'federal monies' were sufficient in themselves to warrant federal-question jurisdiction over a state law breach of contract claim." *Id.* at 17 (quoting *Mun. of San Juan v. Corporacion Para El Fomento Economico De La Ciudad Cap.*, 415 F.3d 145, 148 n.6 (1st Cir. 2005), *abrogated by Mayaguez*, 726 F.3d 8 (1st Cir. 2013)). United's arguments along similar lines cannot revive this defunct precedent. Any determination about MassHealth's compliance with its federal-law obligations regarding SCO Plans "would not govern a 'large number' of cases, as required by [First Circuit] precedent, and is instead specific to the relatively unique situation presented in this case," making it not substantial to the federal system and not an appropriate basis for federal-question jurisdiction. *See Tyngsboro Sports II Solar*, 88 F.4th at 69.

In a vacuum, the word "substantial" may be susceptible to a range of interpretations. But precedent from the Court of Appeals provides considerable guidance in parsing the term. Particularly instructive is the decision in *Mayaguez*. *Mayaguez* provides a helpful benchmark, not because the factual scenario bears much resemblance to this case, but because—as outlined below—the linkage to federal issues was much stronger in *Mayaguez* than is the federal linkage that United proposes here. If *Mayaguez* didn't surmount the hurdle, this case plainly does not.

In *Mayaguez*, the plaintiff was a municipality that had purchased land with money from a federal grant administered by the Department of Housing and Urban Development ("HUD"). *Mayaguez*, 726 F.3d at 10. The municipality turned the land over to the defendant, a real estate development corporation, for a project to be developed in accordance with HUD guidelines and regulations. *Id.* The municipality sued the developer for breach of contract, expressly alleging that the development corporation had breached its contract by failing to comply with federal agency guidelines and regulations. *See id.* at 11 ("According to Mayaguez's theory of the case, in

violating several HUD regulations, [the developer] breached its promise in Deed 91 that the development of Villa Sultanita would 'comply at all times with applicable state and federal laws.'"). The contract at issue in *Mayaguez* expressly required the land "to be developed in accordance with HUD's [grant] program guidelines and regulations." *Id.* at 10. When a HUD audit later "reveal[ed] that millions of dollars in . . . grant funds had been misused in" the local municipality, the municipality sued to recoup the funds from the development corporation, which it alleged "was actually responsible for the mismanagement." *Id.* at 11.

The First Circuit focused its analysis on the "substantiality" prong of *Grable*, assuming, without deciding, that the other *Grable* factors were satisfied. *Id.* at 13. To evaluate substantiality, the Court considered whether either "the outcome of the claim could turn on a new interpretation of a federal statute or regulation which will govern a large number of cases" or the claim "directly challenge[d] the propriety of an action taken by 'a federal department, agency, or service.'" *Id.* at 14 (quoting *Empire Healthchoice*, 547 U.S. at 700).

Holding that the federal issue was "not substantial in the relevant sense to warrant federal jurisdiction," the court in *Mayaguez* concluded that there was no basis for federal jurisdiction. *Id.* at 17. This was so for two reasons. First, the question of the development corporation's compliance with federal regulations was "the sort of 'fact-bound and situation-specific' claim whose resolution is unlikely to have any impact on the development of federal law." *Id.* at 14 (quoting *Empire Healthchoice*, 547 U.S. at 701). Second, the actions of the federal agency (HUD) were not challenged in the action against the development corporation—instead, those federal agency actions "hover[ed] in the background of th[e] dispute." *Id.* at 15. Therefore, the case would "have no impact on the ability of HUD or any other federal agency to carry out its business." *Id.*

The Commonwealth's claims in the case at bar are considerably further distanced from federal law than were the claims in *Mayaguez*. Unlike in *Mayaguez*, in this case there are no federal regulations cited in the Complaint, nor is any federal agency's action at issue in the claims the Commonwealth has pled. The false-claims allegations in this case—for example, that United submitted MDS-HC assessments reporting that patients had diagnoses that were not reflected in their health records or that members received skilled services when they were not actually receiving such services—require the kind of fact-bound determinations that *Mayaguez* held were not substantial to the federal system. Unlike in *Mayaguez*, moreover, these fact-bound determinations do not even turn on a question of compliance with—or application of—federal law. They turn, instead, on whether the specific facts about members' health conditions and needs were accurately reported in the MDS-HC assessments and—potentially—on the meaning of *state* regulations and related guidance. *See* Docket No. 18 at 9.

The First Circuit in *Mayaguez* found it insufficient to confer jurisdiction that a federal agency's actions "hover[ed] in the background." *Mayaguez*, 726 F.3d at 15. Here the "background" is even more remote: the purported federal issues in this case lie at the far edge of the horizon. United cites various instances in which the federal government has pursued relief in connection with Medicaid programs in other states. *See* Docket No. 18 at 17–18. But nowhere does United even suggest that the issues in those states bear any connection to the actual issues in this case.

Given that the federal connection here is much more attenuated than the federal connection in *Mayaguez*, there is no serious argument that the federal issues United raises can be deemed "substantial" under *Grable*.

*4. Federal-State Balance*

Finally, United argues that exercising federal jurisdiction in this case would not disrupt the federal-state balance Congress intended because "it would affirm the federal government's substantial interest in the proper administration of Medicaid managed care programs." Docket No. 18 at 19–20. Rather than "open the floodgates of removal" in Medicaid fraud cases, United insists that such jurisdiction would be limited to cases where "resolution of the state-law causes of action necessarily require interpretation and application of the federal regulations as a threshold matter, and where the obligations created by those regulations are outcome determinative." *Id.* at 20. It strains credulity to assert that this is a case that will "require interpretation and application of the federal regulations," let alone that such interpretation is a "threshold matter," or "outcome determinative." Nor does United's submission realistically suggest any limiting principle that would narrow the gates for removal.

From the Commonwealth's point of view, "[t]he traditional forum for the Commonwealth, acting through its Attorney General, to vindicate the Commonwealth's interests is in the courts of the Commonwealth." Docket No. 15 at 18. If the Court were to exercise jurisdiction over this case, the Commonwealth says, then "every case of Medicaid fraud brought by a state attorney general concerning a managed care organization" would likewise become a federal-question case. *Id.* at 19.

The Commonwealth's position is persuasive. An exercise of jurisdiction here would disrupt the federal-state balance for the reasons identified by the Commonwealth. The Commonwealth here seeks to enforce its own laws and to recover funds it alleges it is owed. As another judge of this Court has noted, "[f]inding federal jurisdiction based on a fact-specific claim brought under [Massachusetts state law] by the Massachusetts Attorney General would . . . risk disturbing the congressionally approved balance of federal and state judicial

responsibilities." *See Massachusetts v. DMB Fin., LLC*, No. 18-CV-11120-ADB, 2018 WL 6199566, at *5 (D. Mass. Nov. 28, 2018).

The federal government's generalized interest in fiscally responsible administration of Medicaid programs is adequately served by having this case proceed in the state court where it was originally filed. And there is no unfairness to United, which may raise the same (tangential) federal-law issues in its defense in that forum. "The state court . . . is competent to apply federal law, to the extent it is relevant." *See Empire Healthchoice*, 547 U.S. at 701.

## CONCLUSION

For the foregoing reasons, I ORDER that the case be REMANDED to the Business Litigation Session of the Superior Court for the County of Suffolk, Massachusetts.

/s/ Paul G. Levenson
Paul G. Levenson
CHIEF U.S. MAGISTRATE JUDGE

Dated: November 18, 2026